**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
        jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALERIE YOUNG and STACEE SEVERINO, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PEOPLE INC. f/k/a DOTDASH MEREDITH,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**TABLE OF CONTENTS**

**PAGE(S)**

NATURE OF THE ACTION ........................................................................................................1

PARTIES .....................................................................................................................................3

JURISDICTION AND VENUE ...................................................................................................3

FACTUAL ALLEGATIONS .......................................................................................................4

I.    THE CALIFORNIA INVASION OF PRIVACY ACT ........................................................4

II.   DEFENDANT VIOLATES THE CIPA.................................................................................6

      A.    The Mechanics And Privacy Implications Of IP Addresses ....................................7

            1.    Differentiating Between a Public Versus Private IP Address ........................8

            2.    The Privacy Implications of Public IP Addresses .......................................10

III.  THE TRACKERS ON THE ALLRECIPES WEBSITE ARE "PEN REGISTERS" ......................................................................................................................13

            1.    *The ADNXS Tracker And The Data Broker Partners It Cookie-Syncs With on the Allrecipes Website* ...............................................14

                  a.    PubMatic..............................................................................................18

                  b.    The Rubicon Tracker.............................................................................21

            2.    *The OpenX Tracker* ....................................................................................23

            3.    *Magnite's Rubicon Project Tracker* .............................................................26

                  a.    ADNX Tracker ....................................................................................28

                  b.    Pubmatic ..............................................................................................29

            4.    *The Pubmatic Tracker And The Data Broker Partners It Syncs With on the Allrecipes Website* ..............................................................29

                  a.    Id5 ID Tracker .....................................................................................31

                  b.    The ADNXS Tracker.............................................................................33

IV.   THE TRACKERS ON THE INSTYLE WEBSITE ARE "PEN REGISTERS" ......................................................................................................................33

            *1.*    *The ADNXS Tracker And The Data Broker Partners It Cookie-Syncs With on the InStyle Website* ...................................................34

                a.    The ID5 ID Tracker .....................................................................37

                b.    The Lijit Tracker.........................................................................38

            *2.*    *The TripleLift Tracker* ...................................................................40

            *3.*    *The Pubmatic Tracker And The Data Broker Partners It Cookie-Syncs With On The InStyle Website* ...............................................42

                a.    The Id5 ID Tracker .....................................................................44

V.     DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY ............................................................................................................46

            1.    Data Brokers .....................................................................................46

            2.    Real-Time Bidding ............................................................................50

            *3.*    *Cookie Syncing* ...............................................................................55

    B.    Defendant Uses The ADNXS Tracker For Identity Resolution, Targeted Advertising, And Data Monetization ...........................................59

    C.    Defendant Uses The Rubicon Project Tracker For Identity Resolution, Targeted Advertising, And Data Monetization....................................61

    D.    Defendant Uses The Pubmatic Tracker For Identity Resolution, Targeted Advertising, And Data Monetization .........................................62

    E.    Defendant Uses The OpenX Tracker For Identity Resolution, Targeted Advertising, And Data Monetization .........................................66

VI.    PLAINTIFFS' EXPERIENCE .................................................................68

    A.    Plaintiff Valerie Young ...............................................................68

    B.    Plaintiff Stacee Severino ...........................................................69

CLASS ALLEGATIONS.............................................................................................72

CAUSES OF ACTION................................................................................................74

PRAYER FOR RELIEF .............................................................................................76

JURY TRIAL DEMANDED ......................................................................................76

Plaintiffs Valerie Young and Stacee Severino ("Plaintiffs") bring this action individually and on behalf of all others similarly situated against People Inc. f/k/a DotDash Meredith Inc., ("People" or "Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendant is the largest digital and print media publisher in America.[1] Defendant owns and operates several Websites and print publications such as PEOPLE, Food & Wine, Travel + Leisure, Allrecipes, Better Homes & Gardens, InStyle, Verywell, Entertainment Weekly, Southern Living and many others (together, the "Websites").[2][3]

2.      People has a readership of 175 million monthly. One of Defendant's Websites, www.allrecipes.com (the "Allrecipes Website"), reached 38.2 million people in 2024.[4] Similarly, www.InStyle.com (the "InStyle Website") has 14 million unique monthly visitors.[5]

3.      When users visit Defendant's Websites, Defendant causes at least four Trackers—the ADNXS Tracker, the Rubicon Tracker, the Pubmatic Tracker, and the OpenX Tracker (collectively, the "Trackers")—to be installed on the internet browsers of the Websites' visitors.  The Trackers are operated by separate and distinct third parties: Microsoft Corporation ("Microsoft"), Magnite Inc. ("Magnite"), Pubmatic Inc. ("Pubmatic"), and OpenX Technologies, Inc. ("OpenX"), respectively (together, the "Third Parties").

---

[1]  https://www.prnewswire.com/news-releases/dotdash-meredith-is-now-people-inc-302518654.html

[2] *Id.*

[3] Defendant's conduct is not limited to the Allrecipes and Instyle Websites.  Similar tracking technologies are utilized on at least the following additional websites owned by Defendant: brides.com, eatingwell.com, foodandwine.com, realsimple.com, seriouseats.com, thespruceeats.com, thesprucepets.com, thoughtco.com, treehugger.com, byrdie.com, and southernliving.com. Discovery may demonstrate the existence of similar violations on other websites owned by Defendant.

[4] https://www.people.inc/featured/assets/ddm/mediakit/Allrecipes-Media-Kit.pdf

[5] https://improvado.io/resources/instyle-media-kit#:~:text=Founded%20in%201994%2C%20InStyle%20has,result%20of%20reading%20an%20ad.

4.      Through their respective Trackers, the Third Parties collect the Websites' users' internet protocol ("IP") addresses and other device identifier information such as device type, browser type, and unique and persistent identifiers ("Device Metadata").  The Third Party Trackers also set a cookie that includes a unique user identifier, which the Trackers collect on subsequent visits, and which is used by the Third Parties to identify and deanonymize the user.

5.      Defendant and the Third Parties use the data collected by the Trackers to identify and de-anonymize users, hyper-target advertisements to users, and to enrich themselves.

6.      Because the Trackers capture the Websites' visitors' "routing, addressing, or signaling information," the Trackers each constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA").  (Cal. Penal Code § 638.50(b).)

7.      By installing and using the Trackers without Plaintiffs' prior consent and without a court order, Defendant violated CIPA § 638.51(a).

8.      The allegations here are made more invasive by the entities operating the Trackers and collecting Plaintiffs' and Class Members' IP Addresses and Device Metadata.  Pubmatic, Magnite, and OpenX are registered data brokers in California that focus on identifying and de-anonymizing users through identity resolution services.  The purpose of this is to enrich the value of Defendant's Websites users by linking those users' IP addresses and Device Metadata to profiles that contain as much personal and demographic information as possible.  Users are then offered up for sale with all this collated information to interested advertisers, with advertisers placing bids through platforms like Microsoft's.  Advertisers can then target users of the Websites better based on these attributes and will therefore pay Defendant more to show advertisements to Defendant's users.  And the Third Parties share all this data between each other and with various other entities through a process called "cookie syncing," meaning Plaintiffs' and Class Member's information winds up in the hands of untold numbers of third parties, without consent.

9.      In sum, Defendant's scheme is to tie users' browsing activity on the Websites with personal information disclosed on other sites—all captured by the Trackers—to sell this collated information to advertisers.  All of this enriches Defendant through advertising revenue, makes the

Third Parties' services (*i.e.*, their Trackers) more valuable to Defendant and other customers, and strips Plaintiffs and Class Members of their anonymity and privacy in the process.

10. Plaintiffs bring this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

## PARTIES

11. Plaintiff Valerie Young is a California citizen who, at all relevant times, resided in San Francisco, California. At all relevant times, Plaintiff Young was in California when she visited Defendant's Website instyle.com.

12. Plaintiff Stacee Severino is a California citizen who, at all relevant times, resided in Crescent City, California. At all relevant times, Plaintiff Young was in California when she visited Defendant's Website allrecipes.com.

13. Defendant People, Inc. is a Delaware corporation based in New York, New York. Defendant People, Inc., operates and maintains numerous media websites and digital channels.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a different state than Defendant.

15. This Court has jurisdiction over Defendant because through Defendant's installation and use of the Trackers on the Website, Defendant can engage in "programmatic advertising," which is the process of "buy[ing] and sell[ing] digital ads. Programmatic advertising serves up relevant ad impressions to audiences through automated steps, in less than a second."[6] The Third Parties are players in the programmatic advertising space.

---

[6] WHAT IS PROGRAMMATIC ADVERTISING?, https://advertising.amazon.com/blog/programmatic-advertising.

16.    By using the Trackers on its Websites, Defendant targets users with advertisements relevant to not only who they are, but where they are located.  That is, California users of the Website will see different advertisements than New York users of the Website based (in part) on location, as ascertained from their IP addresses.  Thus, Defendant purposefully availed itself of the California market because it caused the Third Parties to collect the IP addresses and Device Metadata of Californians, using this information in conjunction with the Third Parties to target Californians with advertisements relevant to their location.

17.    Defendant reaps substantial revenue from this unlawful disclosure of California users' information from its Websites and, indeed, can monetize its Websites through programmatic advertising.

18.    Defendant also targets California users knowingly, as it can sell specific California userbases to advertisers, or target advertising campaigns specifically at California users, as users are identified as being in California through their IP addresses.  *See Briskin v. Shopify, Inc.*, 135 F.4th 739, 759 (9th Cir. 2025) ("Shopify knows about its California consumer base, conducts its regular business in California, contacts California residents, interacts with them as an intermediary for its merchants, installs its software onto their devices in California, and continues to track their activities.  This conduct connects Shopify to California in a meaningful way.") (cleaned up)

19.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

**I.    THE CALIFORNIA INVASION OF PRIVACY ACT**

20.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

21.    As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

22. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

23. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(b).

24. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

25. Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line. As technology advanced, however, courts have expanded the application of these surveillance devices to Internet tracking technology.

26. For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

27. Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also*, *e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC,* 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Lesh v. Cable News Network, Inc.*, 767 F.Supp.3d 33 (S.D.N.Y. Feb. 20, 2025) (same); *Moody v. C2 Educ. Sys. Inc.* 742 F. Supp. 3d 1072, 1077 (C.D.

Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Websites and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.* 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC* 2022 WL 1744107 (9th Cir. May 31, 2022), at *1 ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications.").

28.    This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.* 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

29.    Individuals may bring an action against the violator of any provision of CIPA—including CIPA § 638.51—for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

## II.    DEFENDANT VIOLATES THE CIPA

30.    To make Defendant's Websites load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Websites' data is stored.  In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions.  A general diagram of this process is pictured at Figure 1, which explains how Defendant's Websites transmit instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



31. The server's instructions include how to properly display the Websites—*e.g.*, what images to load, what text should appear, or what music should play.

32. In addition, the server's instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address and Device Metadata—to the Third Parties.

33. The Third Parties' Trackers will also set a cookie corresponding with a user ID unique to their Tracker that also allows the user to be tracked across the Internet and have their information synced between multiple entities.

34. Because, as described below, the Trackers collect users' addressing, routing, or signaling information—IP addresses, Device Metadata, and/or the unique user IDs—the Trackers are pen registers.

35. Plaintiffs and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

### A. The Mechanics And Privacy Implications Of IP Addresses

36. An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[7]

37. Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

---

[7] *See, e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

### 1. Differentiating Between a Public Versus Private IP Address

38.     A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally.  Public IP addresses are required for devices that need direct internet access.

39.     While public IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible.  If an individual is not actively sending data packets out, the public IP address remains private and is not broadcast to the wider internet.

40.     Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.  This geolocation capability is leveraged by online advertising and user identification services.

41.     A private IP address is used within an internal network and is not routable on the public internet.  The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255).  Thus, private IP addresses can be used repeatedly across different networks because they are isolated from the global internet.  For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

42.     The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication.   And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

43.     An analogy is useful.  A public IP address is like the number for a landline telephone for a household.  A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2").  The public IP address determines the phone number who is making the call, which provides the most identifying information.  On the other hand, knowing

whether Handset #1 versus Handset #2 is making a call allows one to distinguish between members of the same household.

44.     The same is true of IP addresses.  The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large.  On the other hand, private IP addresses effectively distinguish between users in the same household accessing a website.[8]

**<u>Figure 2:</u>**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

45.     Thus, the differences between public and private IP addresses are as follows:[9]

---

[8] While the Trackers do not collect private IP addresses, as discussed below, the Trackers collect Device Metadata that distinguishes between devices accessing the same public IP address in the same way a private IP address would.  So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the Device Metadata).

[9] *What's The Difference Between A Public And Private IP Address?*, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

46.    A public IP address is therefore "routing, addressing, or signaling information."

47.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

48.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[10]

**2.    The Privacy Implications of Public IP Addresses**

49.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[11]

50.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities,

---

[10] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[11] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

neighborhoods, and … postal code"[12] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[13] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[14] because "[c]ompanies can use an IP address … to personally identify individuals."[15]

51. In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[16] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[17]

52. "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[18]

53. "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[19]

[12] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[13] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/54j8hj5b.

[14] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[15] Trey Titone, *The Future Of Ip Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[16] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[17] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[18] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[19] *Id.*

54.    Thus, when Defendant installs and use the Third Party Trackers, it knows its conduct is specifically targeting and affecting Californians based on the public IP addresses.

55.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[20]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[21]

56.    Moreover, "IP address targeting can help businesses to improve their overall marketing strategy."[22]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[23]

57.    The collection of IP addresses here is particularly invasive here given several of the Third Parties' statuses as data brokers.  As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[24]

58.    In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, the data brokers mentioned herein specifically attach IP addresses to comprehensive user profiles, tracking Plaintiffs and Class Members across the Internet using their IP addresses and compiling vast reams of other personal information in the process.

[20] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/54j8hj5b.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

59.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[25]

60.    As alleged below, Defendant installs the Trackers on the user's browser for marketing and analytics purposes, and the Trackers collect information—users' IP addresses—that identifies the outgoing "routing, addressing, or signaling information" of the user.  Accordingly, the Trackers are each "pen registers."

## III.    THE TRACKERS ON THE ALLRECIPES WEBSITE ARE "PEN REGISTERS"

61.    Defendant owns and operates the Allrecipes Website: https://allrecipes.com/.

62.    When some companies build their websites, they install or integrate various third-party scripts into the code of the website to collect data from users or perform other functions.[26]

63.    Oftentimes, third-party scripts are installed on websites "for advertising purposes."[27]

64.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[28]

65.    Defendant has incorporated the Trackers' code into the code of its Allrecipes Website, including when Plaintiff Severino and Class Members visited the Allrecipes Website.

66.    When Plaintiff Severino and class Members visited the Allrecipes Website, the Allrecipes Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff Severino's and Class Members' browsers.  This allows the Third Parties—through their respective Trackers—to collect Plaintiff Severino's and Class Members' IP addresses and Device Metadata and pervasively track them across the Internet.

---

[25] *Is an IP Address Personal Data?, Convesio*, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also What Is Personal Data?*, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[26] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[27] *Id*.

[28] *Id*.

67.    The Trackers also cause additional data points to be sent from Plaintiff Severino's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods.  Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies.  Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion.  Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

68.    Defendant and the Third Parties then use the public IP addresses, Device Metadata, and other information of Allrecipes Website visitors that are collected and sent by the Trackers, including those of Plaintiff Severino and Class Members, to deanonymize Plaintiff Severino and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.

69.    At no time prior to the installation and use of the Trackers on Plaintiff Severino's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff Severino's and Class Members' consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

        *1.    The ADNXS Tracker And The Data Broker Partners It
        Cookie-Syncs With on the Allrecipes Website*

70.    Microsoft Corporation is a technology company with software-as-a-service products, such as Microsoft Advertising.  Microsoft owns and operates the ADNXS Tracker, which it provides to website owners like Defendant for a fee.  Microsoft rebranded ADNXS to "Microsoft Invest," but the two are the same service.  ADNXS is a DSP, as defined and described below.

71.    According to Microsoft, "[w]ith an integrated platform advantage and a focus on data-driven performance, [Microsoft] enables you to engage audiences on all screens and drive business results."[29]

72.    In other words, Microsoft facilities the selling of Defendant's Allrecipes Website users to interested advertisers, who will bid to show those users advertisements targeted to their identity and location.  This process enables Defendant to monetize its Allrecipes Website.  To achieve this, Microsoft uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Allrecipes Website.

73.    The first time a user visits Defendant's Allrecipes Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the ADNXS Tracker on the user's browser.  The ADNXS Tracker, in turn, instructs the user's browser to send Microsoft the user's IP address and Device Metadata—which Microsoft records through its Tracker—as the below screenshot from Plaintiff Severino's browser on the Allrecipes Website indicates (relevant portions highlighted in red boxes).[30]

---

[29] *Microsoft Invest*, MICROSOFT ADVERTISING, https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp#accordionb751e6297a-item-73282c0a03.

[30] All but the first three numbers of Plaintiff Severino's IP address are redacted throughout this Complaint to protect her privacy. The screenshot shows her IP address disclosed next to the "x-proxy origin" label at the bottom of the image.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    15

**Figure 4:**



74.    Moreover, Microsoft stores a cookie (the unique identifier, "UUID2" in Figure 4 above) with the user's IP address and Device Metadata in the user's browser cache.  The UUID2 "[r]egisters a unique ID that identifies a returning user's device.  The ID is used for targeted ads."[31]

---

[31] TYSABRL, COOKIES, https://www.tysabri.com/en_us/cookies.html.

75.     When the user subsequently visits Defendant's Allrecipes Website, the ADNXS Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the ADNXS Tracker causes the browser to send the cookie along with the user's IP address and Device Metadata to Microsoft.

76.     Using the IP addresses, Device Metadata, and "uuid2" unique identifier, Microsoft can track and identify Allrecipes Website users across the Internet.  A general diagram of this process is pictured in Figure 5 below, which explains how the Allrecipes Website causes the ADNXS Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the unique identifier value.

**Figure 5:**



77.     If the user clears his or her cookies, then the user wipes out the ADNXS Tracker from its cache.  Accordingly, the next time the user visits Defendant's Allrecipes Website the process begins over again: (i) Defendant's server installs the ADNXS Tracker on the user's browser, (ii) the ADNXS Tracker instructs the browser to send Microsoft the user's IP address and Device Metadata, (iii) the ADNXS Tracker stores a cookie in the browser cache, and (iv) Microsoft will continue to receive the user's IP address and Device Metadata on subsequent visits to the Allrecipes Website as part of the cookie transmission.

78.     In all cases, however, Microsoft receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Allrecipes Website, as the above screenshots indicate.

79.     The ADNXS Tracker will also share the user's UUID2 value with other third parties on the Allrecipes Website.  The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles Microsoft and/or these other third parties may have on the user, which are then provided by Microsoft for sale to advertisers.

80.     In all cases, however, Microsoft receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Allrecipes Website, as the above screenshots indicate.

81.     The ADNXS Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

82.     Further, the ADNXS Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, 701 F. Supp. 3d at 958.

83.     Because the ADNXS Tracker captures the outgoing information—the IP address— from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

### a.     *PubMatic*

84.     As another example, Microsoft syncs the UUID2 with Pubmatic, another registered data broker in California.[32]  As pictured in the below screenshot from Plaintiff Severino's browser on the Allrecipe's Website, the value of the "KRTBCOOKIE_57" parameter matches the value of the UUID2 parameter in Figure 4 above.  This allows Microsoft to obtain whatever information PubMatic has on the user (and vice versa).  Indeed, PubMatic admits that the KRTBCOOKIEs are used "to correlate our user IDs with those of our partners (such as demand side platform clients or other advertising technology companies).  We pass the information stored by the partner in this cookie to the partner when it is considering whether to purchase advertisements.  This enables the partner to make better decisions about whether to display an advertisement to you."[33]  PubMatic also sets a KADUSERCOOKIE on the user's browser (which is likewise syncing with the ADNXS

---

[32] DATA BROKER REGISTRATION FOR PUBMATIC. INC., https://oag.ca.gov/data-broker/registration/186702.

[33] PLATFORM COOKIE & OTHER SIMILAR TECHNOLOGIES POLICY, PUBMATIC, https://pubmatic.com/legal/platform-cookie-policy/.

Tracker), which is used to "uniquely identify each browser or device from which an individual user visits our partners' websites."[34]

**<u>Figure 6:</u>**



85.    PubMatic describes itself as a digital advertising platform that "exist[s] to enable content creators to run a more profitable advertising business, which in turn allows them to invest back into the multi-screen and multi-format content that consumers demand."[35]

---

[34] *Id.*

[35] *The Supply Chain Of The Future*, PubMatic, https://pubmatic.com/about-us.

86. Specifically, PubMatic is a "supply side platform" that helps website operators like Defendant "[m]aximize advertising revenue and control how your audiences are accessed."[36] As explained it more detail below, this makes it apparent that PubMatic (a supply-side platform) would sync its user information with Microsoft (who is operating a demand-side platform here), as PubMatic is trying to sell Defendant's users to advertisers, and Microsoft here is trying to solicit bids from advertisers on Defendant's users.

87. To do this, PubMatic provides a "unique, supply path optimized and addressable brand demand—from the SSP of choice for the top advertisers and agencies in the world."[37]

88. Likewise, PubMatic provides identity resolution the "Identity Hub" service, "a leading ID management tool for publishers that leverages specialized technology infrastructure to simplify the complex alternative identifier marketplace."[38] This allows website operators like Defendant to "drive monetization in cookie-restricted environments" by "[c]onnect[ing] seamlessly with buyers to drive programmatic revenue."[39]

89. Notably, PubMatic also touts its ability to integrate with multiple other third parties—including "over 75 identity and data providers"—"leverage leading identifiers" to "help data owners [like Defendant] driver monetization and help media buyers [*i.e.*, advertisers] drive performance."[40]

90. Indeed, PubMatic enables website operators like Defendant to sell its users to advertisers with a variety of characteristics, including geography.

91. PubMatic also helps advertisers select where to place their ads, to help companies "[s]mash [their] campaign KPIs [key performance indicators]" and "reach [their] target audiences more effectively."[41] One of the ways in which PubMatic accomplishes this is by selling "action packages," which are data sets—pulled together from different sources—to help advertisers target

---

[36] *The Digital Advertising Supply Chain of the Future. Delivered.* PubMatic SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[37] *Id.*

[38] Identity Management. Delivered. PubMatic, https://pubmatic.com/products/identity-hub/.

[39] *Id.*

[40] *Id.*

[41] *Connect With PubMatic's Auction Packages*, PubMatic, https://pubmatic.com/auction-packages.

---

specific customers.[42]   In other words, PubMatic utilizes third-party data, as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

92.    By way of example, PubMatic sells a "Ramadan Auction Package" that targets consumers who observe Ramadan.[43]   This package helps companies target people who have indicated interest in Ramadan Events through consumer behavior, have internet search history such as "Prayer & Fasting," have location data that is "[f]requently seen at places of worship," or have "[d]emographic data" that shows they are married or live with people "who have shown interest towards Ramadan."[44]

b.    *The Rubicon Tracker*

93.    The ADNXS Tracker also syncs with the Rubicon Tracker owned by Magnite. Magnite is a registered data broker in California.[45]

94.    Magnite is another supply-side platform that companies like Defendant use "to monetize their content," and "[t]he world's leading agencies and brands trust [Magnite's] platform to access … billions of advertising transactions each month."[46]

95.    It is estimated that Magnite collects information on a billion website interactions. "By leveraging [its] platform, [Magnite] believe[s] buyers can reach approximately one billion internet users globally, including through many of the world's largest and most premium sellers."[47]

---

[42] *Connect With PubMatic's Auction Packages*, PubMatic, https://pubmatic.com/auction-packages-apac.

[43] *Id.*

[44] *Id.*

[45] DATA BROKER REGISTRATION FOR MAGNITE INC., https://oag.ca.gov/data-broker/registration/568127.

[46] *iHeartMedia and Magnite Unify Access to Broadcast and Digital Audio, Providing Advertisers with a Direct Path to Premium Inventory*, MAGNITE (Jan. 9, 2024), https://investor.magnite.com/news-releases/news-release-details/iheartmedia-and-magnite-unify-access-broadcast-and-digital-audio.

[47] MAGNITE FORM 10-K, at 9 (2016), https://investor.magnite.com/static-files/88921618-9e64-4b6b-9bb1-ef1422015f44.

---

96. Magnite calls its suite of identity resolution products the Magnite Access Suite.[48]

97. Magnite's suite includes four products: Magnite DMP; Magnite Storefront; Magnite Match; and Magnite Audiences.[49]

98. Magnite DMP helps publishers sell their first-party data. It "enables sellers to seamlessly create, [audience] segment[s]" so they can make their data more valuable to buyers.[50]

99. Magnite Storefront "enables the activation of buyer and seller first-party data on the sell side and facilitates the buying and selling of third-party data–from discovery to activation–across all of Magnite's platforms."[51]

100. Magnite Match is "a cloud-based solution that allows sellers and buyers to establish a match between data sets" so that a publisher's first-party data can be merged and enhanced with other data about the same individual.[52]

101. Magnite Audiences are "cross-publisher segments that Magnite packages to make it easier and more efficient for buyers to reach high value audiences at scale."[53] In other words, Magnite takes a publisher's first-party data and combines it with first-party data from other publishers where the individuals have similar interests based on their web activity, which "generates a potential new revenue stream for publishers with no additional operational overhead."[54]

102. In other words, Magnite compiles comprehensive user profiles by tracking users across the Internet. Magnite then augments the information of its client's end users (like Defendant's end users) with the profile data to make that information more valuable to advertisers by aggregating that information into a graph, thereby driving Defendant's revenue. To achieve this, Magnite uses

---

[48] *Introducing Magnite Access: An Omnichannel Audience, Data and Identity Suite*, MAGNITE (June 15, 2023), https://www.magnite.com/press/introducing-magnite-access-an-omnichannel-audience-data-and-identity-suite/.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

its Rubicon Project Tracker to receive, store, and analyze information collected from website visitors, such as visitors to Defendant's Allrecipes Website.

103.    The first time a user visits Defendant's Allrecipes Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Rubicon Tracker on the user's browser.  The Rubicon Tracker, in turn, instructs the user's browser to send Magnite the user's IP address and Device Metadata—which Rubicon records through its Tracker.

104.    Moreover, Magnite stores a cookie with the user's IP address and Device Metadata in the user's browser cache. When the user subsequently visits Defendant's Allrecipes Website, the Rubicon Project Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the Rubicon Project Tracker causes the browser to send the cookie along with the user's IP address and Device Metadata to Magnite.  .

105.    If the user clears his or her cookies, then the user wipes out the Rubicon Project Tracker from its cache.  Accordingly, the next time the user visits Defendant's Allrecipes Website like Allrecipes the process begins over again: (i) Defendant's server installs the Rubicon Project Tracker on the user's browser, (ii) the Rubicon Project Tracker instructs the browser to send Microsoft the user's IP address and Device Metadata, (iii) the Rubicon Tracker stores a cookie in the browser cache, and (iv) Magnite will continue to receive the user's IP address and Device Metadata on subsequent visits to the Allrecipes Website as part of the cookie transmission.

106.    In all cases, however, Magnite receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Allrecipes Website, as the above screenshots indicate.

2.    *The OpenX Tracker*

107.    OpenX is a registered data broker in California[55] that develops and operates the OpenX Tracker, sometimes called "OpenAudience," which it provides to website owners like Defendant for a fee.

_____

[55] *Data Broker Registration for OpenX Technologies, Inc.*, OFFICE OF THE ATTORNEY GENERAL, https://oag.ca.gov/data-broker/registration/193614.

108.   OpenX helps companies like Defendant "utilize their [first party] data, leverage [third party data], and package up audiences for marketers that will drive ad revenue."[56]

109.   OpenX takes this data and uses it to "match [a company's] audience against [OpenX's] graph to put users in audience segments that [OpenX] mak[es] available to marketers."[57]

110.   In other words, OpenX compiles comprehensive user profiles by tracking users across the Internet.  OpenX then augments the information of its client's end users (like Defendant's end users) with the profile data to make that information more valuable to advertisers by aggregating that information into a graph, thereby driving Defendant's revenue.  To achieve this, OpenX uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors to Defendant's Allrecipes Website.

111.   The first time a user visits Defendant's Allrecipes Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the OpenX on the user's browser.  The OpenX Tracker, in turn, instructs the user's browser to send OpenX the user's IP address and Device Metadata—which OpenX records through its Tracker—as the below screenshot from Plaintiff Severino's browser on the Allrecipes Website indicates (relevant portions in red boxes).

[56] *OpenAudience*, OPENX, https://www.openx.com/why-openx/openaudience/ (last accessed Jan. 27, 2025).  First-party data is data that websites "collect directly from [their] customers," while third-party data is data that is "acquire[d] from a data aggregator" that does "not collect data directly but obtain[s] it from other companies and compile[s] it into a single dataset."  WHAT IS THE DIFFERENCE BETWEEN FIRST-PARTY, SECOND-PARTY AND THIRD-PARTY DATA?, CUSTOMER DATA PLATFORM RESOURCE, https://tinyurl.com/2htc6a8n.

[57] *Data Activation*, OPENX, https://www.openx.com/why-openx/openaudience/.

**Figure 7:**

112. Moreover, OpenX stores a cookie with the user's IP address and Device Metadata in the user's browser cache. When the user subsequently visits Defendant's Allrecipes Website, the OpenX Tracker locates the cookie identifier stored on the user's browser. If the cookie is stored on the browser, the OpenX Tracker causes the browser to send the cookie along with the user's IP address and Device Metadata to OpenX. A general diagram of this process is pictured as Figure 5, which explains how the Allrecipes Website causes the OpenX Tracker to install a cookie on the

user's browser and instructs the user's browser to send the user's IP address and Device Metadata through the cookie.

113.    If the user clears his or her cookies, then the user wipes out the OpenX Tracker from his or her cache.  Accordingly, the next time the user visits Defendant's Allrecipes Website the process begins over again: (i) Defendant's server installs the OpenX Tracker on the user's browser, (ii) the OpenX Tracker instructs the browser to send OpenX the user's IP address and Device Metadata, (iii) the OpenX Tracker stores a cookie in the browser cache, and (iv) OpenX will continue to receive the user's IP address and Device Metadata on subsequent visits to the Allrecipes Website as part of the cookie transmission.

114.    In all cases, however, OpenX receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Allrecipes Website, as the above screenshots indicate.

115.    The OpenX Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

116.    Further, the OpenX Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, 701 F. Supp. 3d at 958.

117.    Because the OpenX Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

### 3.    *Magnite's Rubicon Project Tracker*

118.    As stated above, Magnite is a registered data broker in California

119.    The first time a user visits Defendant's Allrecipes Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Rubicon Project Tracker on the user's browser.  The Rubicon Tracker, in turn, instructs the user's browser to send Magnite the user's IP address and Device Metadata—which Magnite records through its Tracker—as the below screenshot from Plaintiff Severino's browser on the Allrecipes Website indicates (relevant portions highlighted in red boxes).

**Figure 8:**





120.    Moreover, Magnite stores a cookie with the user's IP address and Device Metadata in the user's browser cache. When the user subsequently visits Defendant's Allrecipes Website, the Rubicon Project Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the Rubicon Project Tracker causes the browser to send the cookie along with the user's IP address and Device Metadata to Magnite.

121.    If the user clears his or her cookies, then the user wipes out the Rubicon Project Tracker from its cache.  Accordingly, the next time the user visits Defendant's Allrecipes Website like Allrecipes the process begins over again: (i) Defendant's server installs the Rubicon Project Tracker on the user's browser, (ii) the Rubicon Project Tracker instructs the browser to send OpenX the user's IP address and Device Metadata, (iii) the Rubicon Tracker stores a cookie in the browser cache, and (iv) Magnite will continue to receive the user's IP address and Device Metadata on subsequent visits to the Allrecipes Website as part of the cookie transmission.

122.    In all cases, however, Magnite receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Allrecipes Website, as the above screenshots indicate.

123.    The Rubicon Project Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data."  *Greenley*, 684 F. Supp. 3d at 1050.

124.    Further, the Rubicon Project Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, 701 F. Supp. 3d at 958.

125.    Because the Rubicon Project Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

    a.    *ADNX Tracker*

126.    Magnite syncs with Microsoft's ADNX Tracker. As described above, Microsoft uses its ADNXS Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Allrecipes Website.

127.    The first time a user visits Defendant's Allrecipes Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the ADNXS Tracker on the user's browser.  The ADNXS Tracker, in turn, instructs the user's browser to send Microsoft the user's IP address and Device Metadata—which Microsoft records through its Tracker.

128.    Microsoft receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Allrecipes Website, as the above screenshots indicate.

129.    The ADNXS Tracker will also share the user's UUID2 value with other third parties on the Allrecipes Website.  The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles Microsoft and/or these other third parties may have on the user, which are then provided by Microsoft for sale to advertisers.

### b.    *Pubmatic*

130.    As described above, Pubmatic uses its Pubmatic Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Allrecipes Website.

131.    The first time a user visits Defendant's Allrecipes Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Pubmatic Tracker on the user's browser.  The Pubmatic Tracker, in turn, instructs the user's browser to send Pubmatic the user's IP address and Device Metadata—which Pubmatic records through its Tracker—as the below screenshot from Plaintiff Severino's browser on the Allrecipes Website indicates (relevant portions highlighted in red boxes).

132.    Pubmatic receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Allrecipes Website, as the above screenshots indicate.

133.    The Pubmatic Tracker will also share the user's UUID2 value with other third parties on the Allrecipes Website.  The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles Pubmatic and/or these other third parties may have on the user, which are then provided by Microsoft for sale to advertisers.

### 4.    *The Pubmatic Tracker And The Data Broker Partners It Syncs With on the Allrecipes Website*

134.    As described above, Pubmatic uses its Pubmatic Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Allrecipes Website.

135.    The first time a user visits Defendant's Allrecipes Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Pubmatic Tracker on the user's browser.  The Pubmatic Tracker, in turn,

instructs the user's browser to send Pubmatic the user's IP address and Device Metadata—which Pubmatic records through its Tracker—as the below screenshot from Plaintiff Severino's browser on the Allrecipes Website indicates (relevant portions highlighted in red boxes).

**Figure 9:**

136. Pubmatic receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Allrecipes Website, as the above screenshots indicate.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                30

137. The Pubmatic Tracker will also share the user's UUID2 value with other third parties on the Allrecipes Website. The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles Pubmatic and/or these other third parties may have on the user, which are then provided by Microsoft for sale to advertisers.

138. In all cases, however, Pubmatic receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Allrecipes Website, as the above screenshots indicate.

139. The Pubmatic Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

140. Further, the Pubmatic Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, 701 F. Supp. 3d at 958.

141. Because the Pubmatic Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

a. *Id5 ID Tracker*

142. For example, PubMatic syncs the KADUSERCOOKIE value with the ID5 ID Tracker owned by ID5 Technology Ltd.

143. This allows PubMatic to obtain whatever information ID5 has on the user (and vice versa). Indeed, the "id5-sync.com" value leaves little doubt that PubMatic is matching its cookies with ID5 to obtain any information ID5 has about Plaintiff Severino (and vice versa). ID5 also enhances the information PubMatic knows about Plaintiff Severino with information that ID5 knows about Plaintiff Severino. Finally, ID5 enhances this user information by installing its own cookie on Plaintiff Severino's browser for further tracking, syncing, and de-anonymization.

144. In fact, ID5 boasts that its "ID5 ID" "is a next-generation universal identifier that publishers, advertisers and ad tech platforms can use to recognise users and deliver campaign objectives across different types of devices without relying on traditional identification methods (e.g.

third-party cookies and MAIDs)."[58]  It helps website owners like Defendant utilize their first party data by "leveraging a variety of signals such as hashed email addresses, page URL, IP addresses, timestamps etc., as well as a machine learning algorithm" to package up audiences for marketers that will drive ad revenue.[59]  It does this with "IdentityCloud," its comprehensive suite of services.[60]

145.    According to ID5, it "provides an evolving suite of identity solutions for the digital advertising ecosystem" to "enable[e] effective advertising. [Its] technology platform enables publishers and advertisers to more effectively recognize browsers and other devices over time by generating a unique, pseudonymous ID."[61]  This helps website owners like Defendant recognize users and target them for advertisements.

146.    ID5's "Adaptive Identity" technology is "designed to solve identity challenges at scale in a fragmented ecosystem.  At its core is machine learning, which allows [ID5] to move beyond rigid rules and one-size-fits-all approaches. Instead of relying on static logics, Adaptive Identity continuously learns from behavioral patterns, environments, and outcomes, making identity resolution smarter, more accurate, and more resilient over time."[62]  It can follow website users "across channels, across devices, and across the ecosystem."[63]

147.    The upshot of all this is that ID5 enables website owners like Defendant to effectively sell their user inventory to advertisers in a de-anonymized, targeted format.  By syncing its tracker with PubMatic's, ID5 facilitates this goal, leveraging PubMatic's replete database of user profiles to de-anonymize and identify Website users.

---

[58] ID5, https://github.com/id5io/id5-api.js/blob/master/README.md; *see also*, *First-party IDs and identity resolution methods explained,* ID5, (March 23, 2022), https://id5.io/news/first-party-ids-and-identity-resolution-methods-explained (ID5 uses "hashed email addresses and IP addresses" to "reconcile users across domains and devices.").

[59] ID5, https://github.com/id5io/id5-api.js/blob/master/README.md

[60] *ID5 Launches IdentityCloud, the Comprehensive Identity Solution for Digital Advertising*, EXCHANGEWIRE (Oct. 21, 2021), https://www.exchangewire.com/blog/2021/10/21/id5-launches-identitycloud-comprehensive-identity-solution/.

[61] ID5, https://id5.io/platform-privacy-policy/.

[62] ID5, https://id5.io/news/introducing-adaptive-identity-a-smarter-approach-to-addressability-for-a-connected-world.

[63] *Id*.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    32

148. PubMatic, in turn, builds on its already expansive database by learning whatever ID5 knows about the Website user. And Defendant profits from installing both trackers on its Website because its users can be sold to advertisers for more money, thus enriching Defendant.

b.    *The ADNXS Tracker*

149. PubMatic also syncs the KADUSERCOOKIE value with the ADNXS Tracker on the Allrecipes Website.

150. As described above, Microsoft uses its ADNXS Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Allrecipes Website.

151. The first time a user visits Defendant's Allrecipes Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the ADNXS Tracker on the user's browser. The ADNXS Tracker, in turn, instructs the user's browser to send Microsoft the user's IP address and Device Metadata—which Microsoft records through its Tracker.

152. Microsoft receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the Allrecipes Website, as the above screenshots indicate.

153. The ADNXS Tracker will also share the user's UUID2 value with other third parties on the Allrecipes Website. The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles Microsoft and/or these other third parties may have on the user, which are then provided by Microsoft for sale to advertisers.

154. PubMatic, in turn, builds on its already expansive database by learning whatever Microsoft knows about the Website user. And Defendant profits from installing both trackers on its Website because its users can be sold to advertisers for more money, thus enriching Defendant.

IV.    **THE TRACKERS ON THE INSTYLE WEBSITE ARE "PEN REGISTERS"**

155. Defendant owns and operates the InStyle Website: https://instyle.com/.

156. Defendant has incorporated the Trackers' code into the code of its InStyle Website, including when Plaintiff Young and Class Members visited the InStyle Website.

157. When Plaintiff Young and Class Members visited the InStyle Website, the InStyle Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff Young's and Class Members' browsers. This allows the Third Parties—through their respective Trackers—to collect Plaintiff Young's and Class Members' IP addresses and Device Metadata and pervasively track them across the Internet.

158. The Trackers also cause additional data points to be sent from Plaintiff Young's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

159. Defendant and the Third Parties then use the public IP addresses, Device Metadata, and other information of InStyle Website visitors that are collected and sent by the Trackers, including those of Plaintiff Young and Class Members, to deanonymize Plaintiff Young and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.

160. At no time prior to the installation and use of the Trackers on Plaintiff Young's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff Young's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

1. *The ADNXS Tracker And The Data Broker Partners It Cookie-Syncs With on the InStyle Website*

161. As described above, Microsoft uses its ADNXS Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's InStyle Website.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                34

162.    The first time a user visits Defendant's InStyle Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the ADNXS Tracker on the user's browser.  The ADNXS Tracker, in turn, instructs the user's browser to send Microsoft the user's IP address and Device Metadata—which Microsoft records through its Tracker—as the below screenshot from Plaintiff Young's browser on the InStyle Website indicates (relevant portions highlighted in red boxes).

**Figure 10:**



163.    Microsoft receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the InStyle Website, as the above screenshots indicate.

164.    The ADNXS Tracker will also share the user's UUID2 value with other third parties on the InStyle Website.  The explicit purpose of this process—which is called "cookie syncing" and

is alleged in more detail below—is to identify the user by matching that user with any profiles Microsoft and/or these other third parties may have on the user, which are then provided by Microsoft for sale to advertisers.

165. In all cases, however, ADNXS receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the InStyle Website, as the above screenshots indicate.

166. The ADNXS Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

167. Further, the ADNXS Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, 701 F. Supp. 3d at 958.

168. Because the ADNXS Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

> a. *The ID5 ID Tracker*

169. For example, Microsoft syncs the uuid2 value with the ID5 ID Tracker, as Figure 11 shows:

**Figure 11:**



170. This allows Microsoft to obtain whatever information ID5 has on the user (and vice versa). Indeed, the "id5-sync.com" value leaves little doubt that Microsoft is matching its cookies with ID5 to obtain any information ID5 has about Plaintiff Young (and vice versa). ID5 also enhances the information Microsoft knows about Plaintiff Young with information that ID5 knows

about Plaintiff Young.  Finally, ID5 enhances this user information by installing its own cookie on Plaintiff Young's browser for further tracking, syncing, and de-anonymization.

171.    Microsoft, in turn, builds on its already expansive database by learning whatever ID5 knows about the InStyle Website user.  And Defendant profits from installing both trackers on its InStyle Website because its users can be sold to advertisers for more money, thus enriching Defendant.

b.    *The Lijit Tracker*

172.    Another example, Microsoft syncs the uuid2 value with the Lijit Tracker, which is owned and operated by Sovrn Holdings as Figure 12 shows below:

**Figure 12:**



173.    Sovrn collects information on Internet users' activity on a wide variety of websites through the use of the Lijit Pixel it owns and develops. The advertisers that Sovrn partners with have their own pixels (the "Partner Pixels"), which are embedded into website designs. To support the identity resolution process (detailed below), these pixels trigger (load) Sovrn's pixels on the website, enabling more effective ad targeting and measurement.

174.    Specifically, Sovrn, via the Lijit pixel, collects information used to identify individuals across the Internet including, but not limited to, cookies, IP addresses, email addresses, HTTP headers that specify information such as type of browser, device and operating system

information, location information, and other unique identifiers associated with web addresses.[64]  In addition, Sovrn collects information regarding the users' activity on the websites and communications with the websites in the form of full-string URLs.  Finally, Sovrn is able to pair this information to any it has otherwise collected about the user and has compiled into a profile of the user that Sovrn maintains, as alleged below.

175.    In other words, Sovrn enables companies to sell their user inventory to advertisers, thereby earning revenue.  To achieve this, Sovrn uses its Lijit Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's InStyle Website.

176.    When a user visits Defendant's InStyle Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Lijit Tracker on the user's browser.  The Lijit Tracker, in turn, instructs the user's browser to send Sovrn the user's IP address and Device Metadata—which the Lijit Tracker records—as indicated in the below screenshot of Plaintiff Young's browser traffic on the InStyle Website (relevant portions highlighted in red boxes).

177.    When the user subsequently visits Defendant's InStyle Website, the Lijit Tracker locates these unique identifiers stored on the user's browser.  If these unique identifiers are stored on the browser, the Lijit Tracker causes the browser to send the unique identifiers along with the user's IP address and Device Metadata to Sovrn.

178.    If the user clears his or her cookies, then the user wipes out the Lijit Tracker from its cache.  Accordingly, the next time the user visits Defendant's InStyle Website, the process begins over again: (i) Defendant installs the Lijit Tracker on the user's browser, (ii) the Lijit Tracker instructs the browser to send Sovrn the user's IP address and Device Metadata, (iii) the Lijit Tracker stores unique user identifiers in the browser cache, and (iv) Sovrn will continue to receive the user's IP address and Device Metadata on subsequent visits to the InStyle Website along with the unique user identifiers.

---

[64] https://www.sovrn.com/privacy-policy/privacy-policy/#Our-Information-Sharing-Practices.

179.     This allows Microsoft to obtain whatever information Sovrn has on the user (and vice versa).  Sovrn also enhances the information Microsoft knows about Plaintiff Young with information that Sovrn knows about Plaintiff Young.  Finally, Sovrn enhances this user information by installing its own cookie on Plaintiff Young's browser for further tracking, syncing, and de-anonymization.

180.     Microsoft, in turn, builds on its already expansive database by learning whatever Sovrn  knows about the InStyle Website user.  And Defendant profits from installing both trackers on its InStyle Website because its users can be sold to advertisers for more money, thus enriching Defendant.

### 2.      *The TripleLift Tracker*

181.     TripleLift is a software-as-a-service company that develops and operates the TripleLift Tracker, which it provides to website owners, like Defendant, for a fee.  As described in more detail below, TripleLift is a "supply-side platform."

182.     According to TripleLift, its "technology powers ads that make advertising better for everyone—higher performing for brands, more lucrative for publishers and more respectful of the consumer's experience."[65]

183.     In other words, TripleLift enables companies to sell their user inventory to advertisers, thereby earning revenue.  To achieve this, TripleLift uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's InStyle Website.

184.     When a user visits Defendant's InStyle Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the TripleLift Tracker on the user's browser.  The TripleLift Tracker, in turn, instructs the user's browser to send TripleLift the user's IP address and Device Metadata—which the TripleLift Tracker records—as indicated in the below screenshot of Plaintiff Young's browser traffic on the InStyle Website:

---

[65] *Technology*, TRIPLELIFT, https://triplelift.com/technology.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    40

**<u>Figure 13:</u>**



185.    Moreover, TripleLift stores unique user identifiers in the user's browser cache (the unique identifiers, "TLUID" and "TLUIDP," in Figure 13).  The TLUID "is used to identify web browsers across sites and over time for ad serving purposes."[66]  The TLUIDP "is used to identify web browsers on a top-level domain over time for ad serving purposes *in situations where third party cookies are disabled*."[67]  That is, when Defendant installs TripleLift's Tracker, TripleLift can still track and identify users to sell their information, even if users have purportedly blocked cookies.

186.    When the user subsequently visits Defendant's InStyle Website, the TripleLift Tracker locates these unique identifiers stored on the user's browser.  If these unique identifiers are stored on the browser, the TripleLift Tracker causes the browser to send the unique identifiers along with the user's IP address and Device Metadata to TripleLift.

187.    If the user clears his or her cookies, then the user wipes out the TripleLift Tracker from its cache.  Accordingly, the next time the user visits Defendant's InStyle Website, the process

---

[66] EY, *COOKIE POLICY*, https://www.ey.com/en_ce/legal-and-privacy/cookie-policy.
[67] *Id*.

begins over again: (i) Defendant installs the TripleLift Tracker on the user's browser, (ii) the TripleLift Tracker instructs the browser to send TripleLift the user's IP address and Device Metadata, (iii) the TripleLift Tracker stores unique user identifiers in the browser cache, and (iv) TripleLift will continue to receive the user's IP address and Device Metadata on subsequent visits to the InStyle Website along with the unique user identifiers.

188.    In all cases, however, TripleLift receives a user's IP address, Device Metadata, and unique user ID every time its Tracker is loaded by the InStyle Website.  Using the IP addresses, Device Metadata, and unique user IDs, TripleLift can track and identify InStyle Website users across the Internet.

189.    The TripleLift Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data."  *Greenley*, 684 F. Supp. 3d at 1050.

190.    Further, the TripleLift Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device."  *James*, 701 F. Supp. 3d at 958.

191.    Because the TripleLift Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

3.    *The Pubmatic Tracker And The Data Broker Partners It Cookie-Syncs With On The InStyle Website*

192.    As described above, Pubmatic uses its Pubmatic Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's InStyle Website.

193.    The first time a user visits Defendant's InStyle Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Pubmatic Tracker on the user's browser.  The Pubmatic Tracker, in turn, instructs the user's browser to send Pubmatic the user's IP address and Device Metadata—which Pubmatic records through its Tracker—as the below screenshot from Plaintiff Young's browser on the InStyle Website indicates (relevant portions highlighted in red boxes). Pubmatic also installs its "KADUSER" cookie onto the user's browser, which associates them with a unique ID number.

**Figure 14**:

194.    Pubmatic receives a user's IP address, Device Metadata, and unique user identifier every time its Tracker is loaded by the InStyle Website, as the above screenshots indicate.

195. The Pubmatic Tracker will also share the user's KADUSER value with other third parties on the InStyle Website. The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles Pubmatic and/or these other third parties may have on the user, which are then provided by Pubmatic for sale to advertisers.

196. In all cases, however, Pubmatic receives a user's IP address, Device Metadata, and unique user ID every time its Tracker is loaded by the InStyle Website. Using the IP addresses, Device Metadata, and unique user IDs, Pubmatic can track and identify InStyle Website users across the Internet.

197. The Pubmatic Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." *Greenley*, 684 F. Supp. 3d at 1050.

198. Further, the Pubmatic Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." *James*, 701 F. Supp. 3d at 952.

199. Because the Pubmatic Tracker captures the outgoing information—the IP address—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).

a.    *The Id5 ID Tracker*

200. For example, PubMatic syncs the KADUSERCOOKIE value with the ID5 ID Tracker as Figure 7 shows (*see* text in red box).

**<u>Figure 15:</u>**



201.    This allows PubMatic to obtain whatever information ID5 has on the user (and vice versa).  Indeed, the "id5-sync.com" value leaves little doubt that PubMatic is matching its cookies with ID5 to obtain any information ID5 has about Plaintiff Young (and vice versa).  ID5 also enhances the information PubMatic knows about Plaintiff Young with information that ID5 knows about Plaintiff Young.  Finally, ID5 enhances this user information by installing its own cookie on Plaintiff Young's browser for further tracking, syncing, and de-anonymization.

202.    PubMatic, in turn, builds on its already expansive database by learning whatever ID5 knows about the Website user.  And Defendant profits from installing both trackers on its Website because its users can be sold to advertisers for more money, thus enriching Defendant.

## V.    DATA BROKERS AND REAL-TIME BIDDING: THE INFORMATION ECONOMY

### 1.    *Data Brokers*

203.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[68] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

204.    Any entity that qualifies as a "data broker" under California law must specifically register as such pursuant to Cal. Civ. Code § 1798.99.82(a).  Pubmatic, Magnite, OpenX,[69] and many of the other entities Microsoft syncs its cookies with (*e.g.*, Tapad,[70] Experian,[71] and LiveRamp[72]) are registered as such.

205.    Some data brokers prefer to characterize themselves as "identity graph providers," but this is a distinction without a difference.  "An identity graph provides a single unified view of customers and prospects based on their interactions with a product or website across a set of devices and identifiers.  An identity graph is used for real-time personalization and advertising targeting for millions of users."[73]  This is exactly what data brokers do, and indeed, the entities that provide identity graphs are by and large required to register as data brokers under California law.  An "identity graph provider" is therefore just a euphemism for "data broker."

206.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise

---

[68] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

[69] DATA BROKER REGISTRATION FOR OPENX TECHNOLOGIES, INC., https://oag.ca.gov/data-broker/registration/193614.

[70] DATA BROKER REGISTRATION FOR TAPAD, INC., https://oag.ca.gov/data-broker/registration/187511.

[71] DATA BROKER REGISTRATION FOR EXPERIAN INFORMATION SOLUTIONS, INC., https://oag.ca.gov/data-broker/registration/186691.

[72] DATA BROKER REGISTRATION FOR LIVERAMP, INC., https://oag.ca.gov/data-broker/registration/560496.

[73] IDENTITY GRAPHS ON AWS, https://aws.amazon.com/neptune/identity-graphs-on-aws/.

---

shar[ing] the data with third parties."[74]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[75]

207.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling, meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[76]

208.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[77]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[78]

209.    This data collection has grave implications for Americans' right to privacy.   For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[79]

210.    As another example:

---

[74] SHERMAN, *supra*, at 2.

[75] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

[76] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[77] SHERMAN, *supra*, at 1.

[78] *Id*.

[79] *Id.* at 9.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    47

Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[80]

211. Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[81]

---

[80] *Id.*

[81] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

**Figure 16:**



212.    As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses and Device Metadata, which are is used by data brokers to track users across the Internet.[82]  Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[83]

213.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single."  Then, they sort you into groups of other

---

[82] *Id.* at 11.

[83]  Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

people like you, so they can sell those lists of like-people and generate their income.[84]

214.    In short, by collecting IP addresses and Device Metadata, data brokers can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

215.    As a result of Defendant's installation of the Trackers on the Websites. the information of Plaintiffs and Class Members is linked to any profiles these data brokers may have about them using their IP addresses and Device Metadata (or new profiles are created for Plaintiffs and Class Members).  These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable because of having their IP addresses and Device Fingerprint Information linked to these data broker profiles.

216.    Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff Young's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff Young's and Class Members' IP addresses and Device Metadata without consent.

### 2.    *Real-Time Bidding*

217.    Once data brokers collect Website's users' IP addresses and Device Metadata and create or link that information to comprehensive user profiles, how do these data brokers "sell" or otherwise help Defendant monetizes that information?  This is where real-time bidding—and the Third Parties' Trackers—comes in.

218.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[85]

219.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."  An SSP, which is

---

[84] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

[85] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

at least one function of the OpenX Tracker,[86] "work[s] with website or app publishers to help them participate in the RTB process." "DSPs [which is what the ADNXS Tracker is[87]] primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[88] And an Advertising Exchange—which OpenX also provides[89]—"allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[90]

220. In other words, SSPs like OpenX provide user information to advertisers that might be interested in those users, DSPs like the ADNXS Tracker help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

221. The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.
>
> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[91]

---

[86] *See, e.g.*, OPENX, https://www.openx.com/ (describing itself as the "Most Innovative Independent Supply-Side Platform").

[87] MICROSOFT INVEST, https://about.ads.microsoft.com/en/solutions/technology/microsoft-invest-dsp ("Microsoft Invest is a demand-side platform built for the future of video advertising.").

[88] Geoghegan, *supra*.

[89] *Introducing To Ad Serving*, Microsoft Ignite (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving ("Major ad exchanges include … OpenX").

[90] *Id.*

[91] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

---

**Figure 17:**



222.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and solicit the highest bids.  These entities receive assistance because Defendant also installs a tracker of a data broker on its users' browsers, among others, and all of these trackers sync with each other = to obtain complete user profiles:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road. The DSP [or SSP] enlists a final actor, the data management platform (DMP) [or data brokers/identity graph providers].  DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers … thus enabling easier linkage of the data to the user's profile in the future.[92]

---

[92] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022), https://tinyurl.com/yjddt5ey; *see also* PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

**Figure 18:**



223.    In other words, an SSP is able to solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information the SSP knows about that user with the information other data brokers know about that user.  If there is a match, then the SSP will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

224.    Likewise, a DSP like Microsoft can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with Tapad/Experian, PubMatic, and LiveRamp—who in turn, sync with other data brokers and/or are data brokers themselves.

225.    All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

226.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

(a)    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory— particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

---

(b)    "send[ing] sensitive data across geographic borders."

(c)    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[93]

227.    Given Microsoft operates as a DSP here, the last point is particularly relevant, as it means Microsoft—through the ADNXS Tracker—collects and discloses the Website's users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

228.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[94]

229.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[95]:

---

[93] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[94] Geoghegan, *supra*.

[95] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

**Figure 19:**



230. All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark* 38 Cal. 3d 355, 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

### 3. Cookie Syncing

231. It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Websites (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids). The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                                          55

232.   Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[96] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[97]

Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future.  Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com.  Thus, advertiser.com does not (and cannot) know which users visit website3.com.  However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3)*.
>
> …
>
> When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web*.[98]

---

[96] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[97] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

[98] Papadopoulos, *supra*, at 1433.

**Figure 20:**



233.   Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[99]

234.   On the flip side, "CSync may re-identify web users even after they delete their cookies."[100]   "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[101]   But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure.

---

[99] Papadopoulos, *supra*, at 1434.

[100] *Id*.

[101] *See id*.

Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[102]

235.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[103]

236.    Cookie syncing is precisely what is happening here. When the Trackers are installed on users' of the Websites browsers, they are calling and/or syncing their cookies with other third parties on the Websites. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from actually being anonymous when they visit the Websites.

*        *        *

237.    To summarize the proceeding allegations, the Third Parties are data brokers and identity graph providers that focus on collecting as much information about Website users as possible to create comprehensive user profiles, and sync with numerous other data brokers that do the same. The Third Parties may collect IP Addresses, Device Metadata, and unique user IDs in the first instance, but those are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interest advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

238.    Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, unique IDs) with comprehensive user profiles.

---

[102] *Id.*

[103] *Id.* at 1441.

239. Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

240. Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiffs' and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiffs and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

### B. Defendant Uses The ADNXS Tracker For Identity Resolution, Targeted Advertising, And Data Monetization

241. Microsoft describes its advertising services, which include the ADNXS or Microsoft Invest Tracker, as "a strategic buying platform built for the needs of today's advertisers looking to invest in upper funnel buying and drive business results."[104]

242. Microsoft collects data to help companies with their marketing; when the processing system "receives ad requests, [it] applies data to the request, receives bids, makes decisions, serves creatives, logs, auctions, etc."[105]

243. In particular:

> The Microsoft Advertising platform is a real-time bidding system and ad server. The main processing system is called the "impression bus." The impression bus receives ad requests, applies data to the request, receives bids, makes decisions, serves creatives, logs auctions, etc.
>
> Ad calls come in via our inventory supply partners: exchanges, SSPs, ad networks, and a few valued publishers.
>
> …
>
> Once we get the call, we overlay segment data from our server-side cookie store.  Data is added to the cookie store either through Xandr

---

[104] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest.

[105] *Id.*

> segment pixels or by clients sending us a file of data.  We also contact third-party data providers and overlay any available data.
>
> We contact all of the bidders on our platform. The ad call includes whatever user data belongs to each bidder, and information about the inventory. Bidders have a certain number of milliseconds in which to respond with a bid and the creative they want to serve.
>
> …
>
> The impression bus decides which bid wins based on the amount of the bid, and any preferences the publisher has about what they want served on their page. If the call was client-side, Microsoft Advertising serves the ad. If it was server-side, Microsoft Advertising passes the bid and the location of the creative to the partner who will ultimately serve the ad. [106]

244.    Microsoft Invest (*i.e.*, the ADNXS Tracker) provides "targeting, bidding algorithms, multi-currency support, and all the other features of a premium ad server."[107]  To do this, Microsoft utilizes data from its cookie store.  The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data. [They] also contact third-party data providers and overlay any available data."[108]

245.    Microsoft also integrates with other Trackers (and thus, the other entities those Trackers sync with) on Defendant's Websites to enrich Defendant's user data and therefore obtain higher bids to show advertisements to Defendant's users.   And Microsoft discloses all this information to advertisers that bid on Defendant's users, regardless of whether the advertiser wins the bid.

246.    Further, Microsoft utilizes data from its cookie store.  The "[d]ata is added to the cookie store either through Microsoft Advertising segment pixels or by clients sending [them] a file of data.  [They] also contact third-party data providers and overlay any available data."[109]

247.    In other words, when users visit Defendant's Websites, Microsoft collects users' IP addresses and Device Metadata through its ADNXS Tracker to provide to advertisers interested in

---

[106] https://learn.microsoft.com/en-us/xandr/invest/about-invest

[107] *About Microsoft Invest*, MICROSOFT IGNITE (Feb. 12, 2024), https://learn.microsoft.com/en-us/xandr/invest/about-invest

[108] *Id.*

[109] *Id.*

showing an advertisement to Defendant's Websites users, enriching that information by integrating with other Trackers (and its own data), and ultimately enabling Defendant to monetize its Websites and maximize revenue by collecting and disclosing user information.

**C.    Defendant Uses The Rubicon Project Tracker For Identity Resolution, Targeted Advertising, And Data Monetization**

248.    As indicated above, Defendant utilizes another tracker installed on its Websites that is operated by Magnite, who is also a registered data broker in California.[110]  Magnite's tracker is called "Rubicon."

249.    Magnite is another supply-side platform that companies use "to monetize their content," and "[t]he world's leading agencies and brands trust [Magnite's] platform to access … billions of advertising transactions each month."[111]

250.    It is estimated that Magnite collects information on a billion website interactions. "By leveraging [their] platform, [Magnite] believe[s] buyers can reach approximately one billion internet users globally, including through many of the world's largest and most premium sellers."[112]

251.    Magnite calls its suite of identity resolution products the Magnite Access Suite.[113]

252.    Magnite's suite includes four products: Magnite DMP; Magnite Storefront; Magnite Match; and Magnite Audiences.[114]

253.    Magnite DMP helps publishers sell their first-party data.  It "enables sellers to seamlessly create, [audience] segment[s]" so they can make their data more valuable to buyers.[115]

---

[110] DATA BROKER REGISTRATION FOR MAGNITE INC., https://oag.ca.gov/data-broker/registration/568127.

[111] *iHeartMedia and Magnite Unify Access to Broadcast and Digital Audio, Providing Advertisers with a Direct Path to Premium Inventory*, MAGNITE (Jan. 9, 2024), https://investor.magnite.com/news-releases/news-release-details/iheartmedia-and-magnite-unify-access-broadcast-and-digital-audio.

[112] MAGNITE FORM 10-K, at 9 (2016), https://investor.magnite.com/static-files/88921618-9e64-4b6b-9bb1-ef1422015f44.

[113] *Introducing Magnite Access: An Omnichannel Audience, Data and Identity Suite*, MAGNITE (June 15, 2023), https://www.magnite.com/press/introducing-magnite-access-an-omnichannel-audience-data-and-identity-suite/.

[114] *Id*.

[115] *Id*.

254.    Magnite Storefront "enables the activation of buyer and seller first-party data on the sell side and facilitates the buying and selling of third-party data–from discovery to activation–across all of Magnite's platforms."[116]

255.    Magnite Match is "a cloud-based solution that allows sellers and buyers to establish a match between data sets" so that a publisher's first-party data can be merged and enhanced with other data about the same individual.[117]

256.    Magnite Audiences are "cross-publisher segments that Magnite packages to make it easier and more efficient for buyers to reach high value audiences at scale."[118]  In other words, Magnite takes a publisher's first-party data and combines it with first-party data from other publishers where the individuals have similar interests based on their web activity, which "generates a potential new revenue stream for publishers with no additional operational overhead."[119]

257.    The upshot of all this is that Magnite enables Defendant's Websites to effectively sell their user inventory to advertisers in a de-anonymized, targeted format.  By syncing its tracker with other data brokers and identity graph providers, Magnite facilities this goal, leveraging its replete database of user profiles (described in more detail below) to de-anonymize and identify users of websites such as users of the Allrecipes Website.

258.    Thus, when Magnite offers Allrecipes Website users up for sale to advertisers—as is Magnite's function as a supply-side platform—those users will receive higher bids because they can be better targeted by advertisers as a result of Magnite's synchronization with Defendant.  Defendant, in turn, builds on its already expansive database by learning whatever Magnite knows about the user.

D.    **Defendant Uses The Pubmatic Tracker For Identity Resolution, Targeted Advertising, And Data Monetization**

259.    As noted above, PubMatic is a registered data broker in California that describes itself as a digital advertising platform that "exist[s] to enable content creators to run a more profitable

---

[116] *Id*.

[117] *Id*.

[118] *Id*.

[119] *Id*.

advertising business, which in turn allows them to invest back into the multi-screen and multi-format content that consumers demand."[120]

260.  PubMatic helps companies like Defendant monetize the data of its Websites' users. As noted above, PubMatic is a "supply side platform" that helps website operators like Defendant "[m]aximize advertising revenue and control how your audiences are accessed."[121]

261.  To do this, PubMatic provides a "unique, supply path optimized and addressable brand demand—from the SSP of choice for the top advertisers and agencies in the world."[122]

**Figure 21:**



262.  Likewise, PubMatic provides identity resolution via the "Identity Hub" service, "a leading ID management tool for publishers that leverages specialized technology infrastructure to simplify the complex alternative identifier marketplace."[123]  Notably, this allows website operators like Defendant to "drive monetization in cookie-restricted environments" by "[c]onnect[ing] seamlessly with buyers to drive programmatic revenue."[124]

---

[120] *The Supply Chain Of The Future. Delivered*, PUBMATIC, https://pubmatic.com/about-us.

[121] PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[122] *Id*.

[123] IDENTITY HUB, https://pubmatic.com/products/identity-hub/.

[124] *Id*.

263.    Notably, PubMatic also touts its ability to integrate with multiple other third parties—including "over 75 identity and data providers"—"leverage leading identifiers" to "help data owners [like Defendant] drive monetization and help media buyers [*i.e.*, advertisers] drive performance"[125]:

**<u>Figure 22:</u>**



264.    PubMatic also helps companies like Defendant "[s]mash [their] campaign KPIs [key performance indicators]" and "reach [their] target audiences more effectively."[126]  One of the ways in which PubMatic accomplishes this is by selling "action packages," which are data sets—pulled together from different sources—to help advertisers target specific customers.[127]

265.    In other words, PubMatic utilizes third-party data, as well as data from the publisher like Defendant where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

266.    By way of example, PubMatic sells a "Ramadan Auction Package" that targets consumers who observe Ramadan.[128]  This package helps companies target people who have

---

[125] PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-buyers/.

[126] CONNECT WITH PUBMATIC'S AUCTION PACKAGES, https://pubmatic.com/auction-packages.

[127] *Id.*

[128] RAMADAN AUCTION PACKAGE, https://pubmatic.com/auction-packages/us/ramadan-us/.

indicated interest in Ramadan Events through consumer behavior, have internet search history such as "Prayer & Fasting," have location data that is "[f]requently seen at places of worship," or have "[d]emographic data" that shows they are married or live with people "who have shown interest towards Ramadan."[129]

**Figure 23:**



267.    Thus, when users visit Defendant's Websites, PubMatic records and decodes users' IP addresses, Device Metadata, and unique user ID (the KADUSERCOOKIE) through its PubMatic Tracker—as installed by Defendant—so that Defendant and PubMatic can identify users with PubMatic's suite of identity resolution services, sell Defendant's users to prospective advertisers, and ultimately reap substantial revenue through the programmatic advertising PubMatic assists with. All of this helps Defendant monetize its Websites and maximize revenue by enabling PubMatic to collect as much information about Defendant's users as possible.

---

[129] *Id.*

E.    **Defendant Uses The OpenX Tracker For Identity Resolution, Targeted Advertising, And Data Monetization**

268.    As noted above, OpenX is a registered Data Broker in California. [130]  It claims to be "the world's leading independent supply-side platform (SSP) for audience, data, and identity targeting."[131]  OpenX also provides an advertising exchange, as alleged above.

269.    OpenX's "proprietary identity resolution tool, OpenAudience, uses state-of-the-art data and identity technology to allow marketers to reach their target audiences and segments — connecting [companies] to [their] desired consumers in more ways than you have ever imagined possible."[132]

270.    OpenX does this by taking a company's "first-party data, or any pre-built audience segments, and seamlessly match[ing it] to [OpenX's] identity graph of more than 200 million unique people."[133]

271.    In other words, OpenAudience gathers information of Defendant's Websites' users, such as IP addresses and Device Metadata, compares it against their own records, and combines the two to enhance the information into a deanonymized profile of each individual website visitor.

272.    OpenX can then use these individual profiles to provide marketers, such as Defendant, with curated packages that identify and target specific customers.[134]

273.    OpenX splits this up into two different types of packages.  The first are inventory packages that allows marketers to "[s]howcase [their] brand alongside brand-safe inventory across [OpenX's] network of trusted publishers, reaching consumers *wherever* and *whenever* they engage with their favorite content."[135]  The second are data driven packages that "[e]ngage customers with packages powered by data-driven curation, and drive performance on brand-safe inventory.

---

[130] *About Us*, OPENX, https://www.openx.com/company/.

[131] *Id*.

[132] *Buyers*, OPENX, https://www.openx.com/company/.

[133] *OpenAudience*, OPENX, https://www.openx.com/company/.

[134] *Curated Packages*, OPENX, https://www.openx.com/curated-packages/.

[135] *Id.* (emphasis added).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                              66

[Allowing companies, like Defendant to e]ffortlessly choose from pre-built packages powered by audience, contextual, attention, or sustainability data and [OpenX's] proprietary identity graph."[136]

274.    This identity graph provides companies, like Defendant and the other Third Parties, access to 800 million hashed emails, 200 million hashed phone numbers, over 200 million U.S. users instrumented for data and identity, 48 million CTV users instrumented for data and identity, over 5,000 requests per user per month, and 3,000 data attributes available for targeting.[137]

275.    In other words, OpenX utilizes third-party data (*i.e.*, data OpenX collects on its own), as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party, like data directly from Defendant's Websites' users), to determine where to place advertisers' ads and who to place them in front of.

276.    By way of example, OpenX sells a "Health Insurance Data Driven Package" that targets consumers who have viewed advertisements from health insurance advertisers.[138]  This helps companies target people who have indicated an interest in specific health insurance related content.

**Figure 24:**

  

**Match**
Integrate your first-party data, or any pre-built audience segments, and seamlessly match to our identity graph of more than 200 million unique people.

**Enrich**
Make your data more useful with more than 3,000+ sortable fields, including consumer habits, lifestyle, spend, and more. Refine your data and get more granular, or expand your audience and create look-alikes.

**Activate**
Data and audience segments are useful only if you can run campaigns against them. We'll give you a simple Deal ID that you can use with the DSP of your choice to reach your audiences across our premium supply.

277.    To do all of this, OpenX needs to collect data that identifies a particular user.  This is why OpenX collects IP addresses and Device Metadata: it allows OpenX to link one of Defendant's Websites' users to any profile OpenX may have about that user, and OpenX can in turn provide that

---

[136] *Id.*

[137] *OpenAudience*, OPENX, https://www.openx.com/company/ (last accessed Jan. 27, 2025).

[138] *Health Insurance Data Driven Package*, OPENX, https://www.openx.com/curated-packages/health-insurance/ (last accessed Feb. 04, 2025).

profile to interested advertisers for more targeted advertising. The IP address, Device Metadata, and OpenX cookie, also allow OpenX to track a user's Websites' activity over time (*i.e.*, through repeated Websites visits) and to track that user on other websites.

278. In other words, when users visit Defendant's Websites, OpenX collects users' IP addresses through its OpenAudience Tracker to build comprehensive user profiles, which are used to identify Defendant's users, enrich Defendant's user data, and make those users more valuable to prospective advertisers by allowing advertisers to target specific users better. All of this helps Defendant further monetize its Websites and maximize revenue by collecting and disclosing user information.

279. Indeed, OpenX has previously been sued by the federal government for collecting personally identifiable information from users who specifically asked not to be tracked. (See *United States of America v. OpenX Technologies, Inc.* (C.D. Cal.) Case No. 2:21-cv-09693-DMG-AGR.[139]).

## VI. PLAINTIFFS' EXPERIENCE

### A. Plaintiff Valerie Young

280. Plaintiff Valerie Young regularly visits the InStyle Website on her desktop browser, including as recently as September 2025.

281. When Plaintiff visited the InStyle Website, the Websites' code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff Young's browser. *See* Figures 4-9.

282. Through their respective Trackers, the Third Parties collected Plaintiff Young's IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Third Parties to pervasively track Plaintiff Young across multiple InStyle Website sessions and even other websites, as well as de-anonymize Plaintiff Young by synchronizing her user profile amongst each other and with other entities. *Id*.

283. Defendant and the Third Parties used the information collected by the Trackers to (i) identity Plaintiff Young and either create a new profile of her in the Third Parties' databases or

---

[139] ADVERTISING PLATFORM OPENX WILL PAY $2 MILLION FOR COLLECTING PERSONAL INFORMATION FROM CHILDREN IN VIOLATION OF CHILDREN'S PRIVACY LAW, https://tinyurl.com/yp3f2nm5.

match Plaintiff Young to a pre-existing profile (either in the Third Parties' own databases or with another entity's profile), (ii) sell Plaintiff Young's information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the InStyle Website and the information contained on any profiles of Plaintiff Young (which are linked to Plaintiff Young via the information collected by the Third Parties on the InStyle Website), (iii) actually target Plaintiff Young with advertisements and serve advertisements on Plaintiff Young based on the information collected by the Third Parties on the InStyle Website and the information contained on any profiles of Plaintiff Young (which are linked to Plaintiff Young via the information collected by the Third Parties on the InStyle Website), (iv) de-anonymize Plaintiff Young and generate revenue from the sale of Plaintiff Young's information—both what is collected on the InStyle Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

284.    Plaintiff Young did not provide her prior consent to Defendant to install or use the Trackers on her browser.  Nor could Plaintiff Young provide prior consent to Defendant because the cookies that Defendant install sync with Plaintiff Young's and the Class Members' devices the moment that they access the website.  Therefore, their initial visit to the InStyle Website is automatically tracked and linked to Defendant's dossier of Plaintiff Young's and the Class Members' browsing activity and personal information before any consent is even possible.

285.    Defendant did not obtain a court order before installing or using the Trackers.

286.    Thus, Plaintiff Young has had her privacy invaded by Defendant's violations of CIPA § 638.51(a), and Defendant has likewise been unjustly enriched through the Third Parties' surreptitious and unconsented-to collection of Plaintiff Young's data.

287.    Accordingly, Plaintiff Young has been injured by Defendant's violation of the CIPA.

**B.    Plaintiff Stacee Severino**

288.    Plaintiff Stacee Severino regularly visits the Allrecipes Website on her desktop browser, including as recently as September 2025.

289. When Plaintiff visited the Allrecipes Website, the Website's code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff Severino's browser. (See Figures 10-15, *supra*.)

290. Through their respective Trackers, the Third Parties collected Plaintiff Severino's IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Third Parties to pervasively track Plaintiff Severino across multiple Allrecipes Website sessions and even other websites, as well as de-anonymize Plaintiff Severino by synchronizing her user profile amongst each other and with other entities. (See Figures 10-15, *supra*.)

291. Defendant and the Third Parties used the information collected by the Trackers to (i) identity Plaintiff Severino and either create a new profile of her in the Third Parties' databases or match Plaintiff Severino to a pre-existing profile (either in the Third Parties' own databases or with another entity's profile), (ii) sell Plaintiff Severino's information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the InStyle Website and the information contained on any profiles of Plaintiff Severino (which are linked to Plaintiff Severino via the information collected by the Third Parties on the InStyle Website), (iii) actually target Plaintiff Severino with advertisements and serve advertisements on Plaintiff Severino based on the information collected by the Third Parties on the Allrecipes Website and the information contained on any profiles of Plaintiff Severino (which are linked to Plaintiff Severino via the information collected by the Third Parties on the Allrecipes Website), (iv) de-anonymize Plaintiff Severino and generate revenue from the sale of Plaintiff Severino's information—both what is collected on the Allrecipes Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

292. As an example, the data taken from Plaintiff Severino's browser showed OpenX operating a real time bidding auction to serve targeted advertisements to Plaintiff Severino on the Allrecipes Website. As part of the real-time bidding process, OpenX shares information with numerous data brokers, who then bid on advertising space. For example, the second image below shows OpenX syncing with Criteo, a data broker, so that Criteo can bid on the ad space. The

"cto_bundle_hem_api" is the technology Criteo used to collect share email addresses in a "hashed" form, indicating Plaintiff Severino's email address may also have been disclosed.

**Figure 25:**

293.    Plaintiff Severino did not provide her prior consent to Defendant to install or use the Trackers on her browser.  Nor could Plaintiff Severino provide prior consent to Defendant because the cookies that Defendant install sync with Plaintiff Severino 's and the Class Members' devices the moment that they access the website.  Therefore, their initial visit to the Allrecipes Website is automatically tracked and linked to Defendant's dossier of Plaintiff Severino's and the Class Members' browsing activity and personal information before any consent is even possible.

294.    Defendant did not obtain a court order before installing or using the Trackers.

295.    Thus, Plaintiff Severino has had her privacy invaded by Defendant's violations of CIPA § 638.51(a), and Defendant has likewise been unjustly enriched through the Third Parties' surreptitious and unconsented-to collection of Plaintiff Severino's data.

296.    Accordingly, Plaintiff Severino has been injured by Defendant's violation of the CIPA.

## CLASS ALLEGATIONS

297.    Plaintiffs seek to represent a class defined as all California residents who accessed a website owned by Defendant while in California and had their IP address collected by a third party (the "Website Class").

298.    The following people are excluded from the Class: (i) any Judge presiding over this action and members of her or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiffs' counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

299.    **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of people.  It is, therefore, impractical to join each member of the Class as a named Plaintiffs.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class

action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Class is ascertainable and identifiable from Defendant's records.

300. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

(a) Whether Defendant violated CIPA § 638.51(a);

(b) Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);

(c) Whether Defendant sought or obtained prior consent— express or otherwise—from Plaintiffs and the Class;

(d) Whether Defendant sought or obtained a court order for their use of the Trackers; and

(e) Whether Plaintiffs and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

301. **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Class because the named Plaintiffs, like all other members of the Class Members, visited the Website and had her IP address collected by the Trackers, which were installed and used by Defendant.

302. **Adequate Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class Members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

303. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized

litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 638.51(a)

304. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

305. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

306. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

307. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

308. The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address and Device Metadata—from the electronic communications transmitted by Plaintiffs' and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

309. Likewise, the Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the unique user identifiers associated with each Tracker from the electronic

communications transmitted by Plaintiffs' and the Class's computers or smartphones. Cal. Penal Code § 638.50(b).

310. The unique IDs set by the Trackers are "addressing" information because they are used to tie a Website user to the Third Parties' databases and repositories of information about the user and ascertain the user's identity.

311. At all relevant times, Defendant installed the Third Trackers—which are pen registers—on Plaintiffs' and Class Members' browsers, which enabled the Third Parties to collect Plaintiffs' and Class Members' IP addresses, Device Metadata, and unique user IDs.

312. Defendant and the Third Parties used the information collected by the Trackers to (i) identity Plaintiffs and Class Members and either create new profiles of them in the Third Parties' databases or match Plaintiffs and Class Members to pre-existing profiles (either in the Third Parties' own databases or with another entity's profile), (ii) sell Plaintiffs' and Class Members' information to advertisers for hyper-targeted advertising based on the information collected by the Third Parties on the Website and the information contained on any profiles of Plaintiffs and Class Members (which are linked to Plaintiffs and Class Members via the information collected by the Third Parties on the Website), (iii) actually target Plaintiffs and Class Members with advertisements and serve advertisements on Plaintiffs and Class Members based on the information collected by the Third Parties on the Website and the information contained on any profiles of Plaintiffs and Class Members (which are linked to Plaintiffs and Class Members via the information collected by the Third Parties on the Website), (iv) de-anonymize Plaintiffs and Class Members and generate revenue from the sale of Plaintiffs' and Class Members' information—both what is collected on the Website by the Third Parties and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services.

313. When Defendant installed and used the Trackers on Plaintiffs' and Class Members' browsers—and when the Third Parties collected Plaintiffs' and Class Members' information—Defendant knew that Plaintiffs and Class Members were in California based on their IP addresses. Thus, Defendant harmed Plaintiffs and Class Members knowing they were in California, and

unlawfully profited off of Plaintiffs' and Class Members' information knowing that information came from Californians.

314. The Trackers do not collect the content of Plaintiffs' and Class Members' electronic communications with the Website. *See In re Zynga Privacy Litig.* (9th Cir. 2014) 750 F.3d 1098, 1108 ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

315. Plaintiffs and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

316. Defendant did not obtain a court order to install or use the Trackers.

317. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)   For an order certifying the Class, naming Plaintiffs as the representative of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(b)   For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)   For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e)   For pre- and post-judgment interest on all amounts awarded; and

(f)   For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: November 6, 2025

**BURSOR & FISHER, P.A.**

By:  /s/ *Joshua R. Wilner*
Joshua R. Wilner

Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
Email: pfraietta@bursor.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED 77